# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CHRISTIAN MOORE,
*Plaintiff*,

v.

No. 3:13-cv-01160 (JAM)

DEPARTMENT OF CORRECTION *et al.*,
*Defendants*.

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Christian Moore is a black male who worked in the affirmative action unit at the State of Connecticut Department of Correction (DOC). His job was to investigate claims of discrimination against and within the DOC as well as to help the DOC meet its affirmative action hiring goals. When plaintiff encountered troubles with colleagues at work, he concluded that these problems were due to his race, his gender, and his dedication to the work of the affirmative action office.

Workplace conflicts plagued the DOC's affirmative action unit during the time at issue in this lawsuit. The conflicts embroiled employees of different races and genders, as well as many members of a different DOC unit—the human resources department—which performed personnel tasks in collaboration with the affirmative action unit. Both units suffered through and contributed to a tense working environment such that employees of both units began to complain about one another. After that, members of both units alleged retaliation for having filed complaints, and so on.

Plaintiff felt targeted by members of both units, particularly after the head of the human resources department made a FOIA request for plaintiff's emails. The results of this request revealed that plaintiff had extensively used his state computer to send personal emails, and

plaintiff in turn was subject to discipline for misuse of DOC computers. Plaintiff believes the FOIA request and ensuing discipline were motivated by discriminatory and retaliatory animus.

Plaintiff has filed this lawsuit suit against the DOC and various DOC officials including Leo Arnone, Daniel Callahan, Kimberly Weir, Tracey Butler, and Sandra Sharr. He alleges that the DOC as his employer engaged in race- and gender-based discrimination as well as retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* He further alleges cognate claims for discrimination and retaliation under the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60 *et seq.* In addition, he alleges pursuant to 42 U.S.C. § 1983 that each of the individual defendants discriminated against him in violation of his rights under the Equal Protection Clause.

Defendants have moved for summary judgment on all counts (Doc. #60). For the reasons set forth below, I conclude that triable issues of fact remain as to plaintiff's claim of Title VII retaliation against the DOC, as well as his equal protection retaliation claim against defendant Callahan. All other claims and defendants will be dismissed.

## BACKGROUND

The following facts are either agreed upon by both parties or presented in the light most favorable to plaintiff as the non-moving party. The DOC's affirmative action unit was responsible for many duties that dovetailed with those of the DOC's human resources department. The affirmative action unit, for example, was responsible for developing the DOC's affirmative action plan: a plan creating goals for the DOC to achieve representation reflective of the applicable labor market in all aspects of the employer/employee relationship, including in hiring and promotions. With that plan, the human resources department could then embark on recruitment and hiring efforts, but could hire or promote a candidate only if it had adequately

completed paperwork reflecting compliance with the affirmative action plan, consulted with the affirmative action unit throughout most of the hiring process, and received a "sign-off" from the affirmative action unit prior to extending an offer.

The affirmative action unit was also charged with investigating DOC employee complaints of harassment or retaliation. After each investigation, it would forward its findings to the human resources department for a determination of whether a pre-disciplinary hearing should be held, and the human resources department, in turn, would recommend discipline to the Commissioner of the DOC.

In this way, the affirmative action unit and human resources department worked hand in hand, in most tasks relying and depending on each other to perform their job duties. Each unit, too, had a similar structure: each had a department head that reported directly to the Commissioner of the DOC, and underneath that department head worked managers and other employees.

Over the years, tensions simmered between the two departments as each perceived shortcomings in the other during performance of their complementary job duties. In the hiring or promotion process, the affirmative action unit would receive a "recruitment package" from the human resources department that, from the affirmative action unit's perspective, did not comply with the processes or goals set forth in the affirmative action plan; after a period of review, the affirmative action unit would send that package back to the human resources department without approval, challenge the human resources department about the paperwork submitted, and pose questions about, for example, why a "goal" candidate had not been recommended for a position, or why certain explanations had not been provided in the paperwork. *See* Doc. #61 at 147–51; *e.g.*, Doc. #70-4 at 1–3, 7–15.

For its part, the human resources department felt stymied in its efforts to promptly hire qualified candidates for open positions. It believed that the affirmative action unit would purposefully delay acting on or approving several recruitment packages until it could extract a concession on a particular package. *See* Docs. #60-9 at 6–8; #60-7 at 45; #60-10 at 5, #72-1 at 9.

These work-related tensions between the affirmative action unit and the human resources department permeated the ranks of each unit. Managers and subordinates alike begrudged those of the other unit for hindering the hiring/promotion process or the affirmative action goals of the DOC. Doc. #60-9 at 6.

At times, the heads of each unit required the Commissioner's intervention to resolve stalemates. *Id.* at 8. By September of 2009, plaintiff's boss, the director of the affirmative action unit, Bob Jackson, and the director of human resources, Dan Callahan, were barely on speaking terms. Because of that conflict, Jackson delegated to plaintiff, who was then serving in the position of Equal Employment Opportunity Specialist 2, his authority to approve/reject recruitment packages on behalf of the affirmative action unit.

But by 2010, the relationship between the departments had continued to sour, creating a tense and acrimonious working environment for all. Not only had the normal tensions between the units worsened, but now employees of each unit claimed that they *personally* were being retaliated against or harassed by employees of the other unit, on the basis of race, gender, and/or age.

Even the two department heads filed complaints against one another: Callahan (white male) filed a complaint against Jackson (black male), and vice versa. Jackson's complaint of September 3, 2010, against Callahan alleged that "the tone of the conversation [between

Callahan and me relating to a recruitment package] was so intense [that] I concluded based on past experiences that Dan's comment was race related." *See* Doc. #70-2 at 2.

Plaintiff was interviewed on December 2, 2010, and December 7, 2010, in connection with the incident of September 3, 2010, between Callahan and Jackson. *See* Doc. #60-10 at 5–6. He indicated that "Dir. Callahan would call Dir. Jackson and they would argue [about a recruitment package]. . . . [I]t seems like Dir. Callahan would take it personal. When you take something personal, you are already pissed off about it and Dir. Jackson would reciprocate it." *Id.* at 5. Plaintiff stated that, although Jackson and Callahan took their recruitment-package disagreements personally, he did not feel that the interactions between the departments were evidence of invidious discrimination. *Id.* at 4–6.

In the same interview, plaintiff also discussed with investigators a complaint lodged by two affirmative action unit employees, Loyda Borton (Hispanic female) and Debbie Sass (white female), against Jackson (black male). *See id.* at 3–4. Borton and Sass had accused Jackson of retaliating against them for participating in the investigation of a prior complaint by Callahan against Jackson. *See* Docs. #61-1 at 142–42; #60-10 at 4–5; *see also* Doc. #33 (¶¶ 49, 50) to *Jackson v. Conn. Dep't of Corr.*, No. 12cv1714 (AVC). Plaintiff refuted the charge against Jackson, telling the investigator that both Borton and Sass had felt entitled to a certain promotion, but when neither got the promotion, they used "any petty annoyance they have had with [Jackson] . . . to claim retaliation." Doc. #60-10 at 5. Plaintiff also explained that the poor working relationship between Jackson and Borton was Borton's fault, and that the poor working relationship between Jackson and Sass was because Sass preferred to work independently. *See id.* at 3–5.

In the meantime, defendant Leo Arnone began his tenure as the new Commissioner of DOC in July of 2010. At that time, Arnone liked the job plaintiff was doing in the affirmative action unit and worked to promote him, eventually by personally writing to the governor's office.[1] As a result of those efforts, plaintiff was promoted to Equal Employment Opportunity Manager of the affirmative action unit in November of 2010. This new position, however, was subject to a six-month "working test period"; plaintiff would work in the new position and receive a commensurate pay increase, but would not permanently achieve the promotion until passage of the probationary period without incident.

Arnone was well aware of the tensions between the affirmative action unit and the human resources department, and he was specifically aware of the dueling complaints between Callahan and Jackson, as well as the collateral damage wreaked upon others in human resources and the affirmative action unit because of their mutual animosity. He knew that Callahan and Jackson considered their differences relating to recruitment packages to rise to the level of personal and intentional discrimination against one another. Doc. #72-4 at 21.

Over time, Arnone seemed to side with Callahan; when he later testified at a deposition, Arnone agreed that, beyond the normal friction that may arise between affirmative action units and human resources, the affirmative action unit at the DOC was trying to pull a "power play" on human resources, "an immature" thing to do. Doc. #60-7 at 45. Arnone also testified that he did not trust Jackson to submit unadulterated statistics about whether the DOC treated minority employees different from non-minority employees. *See* Doc. #72-4 at 30–32.

Tensions between the affirmative action unit and human resources department boiled over on March 29, 2011, because of a recruitment package—in which a Native American "goal"

---

[1] Callahan, too, recognized plaintiff's potential, and nominated him in late-2010 to an elite, state-wide program that identifies, grooms, and trains future leaders within the State of Connecticut's employ.

candidate was recommended by the human resources department, seemingly a result acceptable to both departments—that plaintiff did not timely approve. Angry e-mails zipped back and forth between subordinates of the two units, then e-mails between the heads of the departments, and then e-mails from the head of one department to the subordinate of the other, such as an e-mail from Callahan to plaintiff on March 30, 2011: "That this package[,] which really was a simple package with one qualified goal candidate, was clearly and purposefully delayed by you is not acceptable to me. Just because you have the power to delay this package does not justify the delay. . . . The way you have treated this package is unfortunately typical of the way this process[ ] has been abused. It [a]ffects the agency, my employees and the candidate in a way that does not meet my standards of professionalism." Doc. #60-13 at 14–15.

The next day, both sides complained to Arnone. *See* Doc. #60-13. Callahan complained of retaliation by plaintiff, whom Callahan suspected was retaliating against him for having filed a complaint against Jackson in September 2010. Doc. #70-6 at 1. Plaintiff, too, complained of retaliation by Callahan against him, suspecting that Callahan was mistreating plaintiff because plaintiff had been on Jackson's side with respect to the September 2010 incident between Callahan and Jackson. Doc. #60-13 at 18 ("I am being targeted because of a discontention for Director Jackson.").

Jackson, too, got involved in this dispute between Callahan and plaintiff, reaching out to Arnone and noting that he was "becoming very concerned for the well being and safety of my employees." *Id.* at 7, 13. Arnone responded to Jackson that "there are equally serious allegations across both units from within and from outside each unit. Some of the complaints seem to be thinly [veil]ed attempts to support a position and some seem to have real merit. We are in the process of investigating all of them." *Id.* at 13.

Not satisfied to wait for the results of the myriad retaliation complaints that had just been lodged, only four days after this incident, on April 4, 2011, Callahan upped the ante by sending a Freedom of Information Act (FOIA) request to the DOC's legal department, seeking, among other documents, "[a]ll e-mails to or from Robert Jackson and Christian Moore for the last two years." Doc. #70-8 at 2.[2] Callahan's FOIA request also asked for the phone records and work calendars of Jackson and plaintiff dating back to September 3, 2010—the date of Jackson's racial discrimination complaint against Callahan—because Callahan wanted to determine whether Jackson had been directing plaintiff to delay recruitment packages in order to get back at Callahan for perceived racism arising in the incident of September 3, 2010, and more generally to "expose" what was happening behind the scenes in the affirmative action unit. *See* Doc. #60-9 at 20–21. Callahan also sought information about certain investigations run by the affirmative action unit because he suspected that the affirmative action unit investigators were sending draft investigations to Jackson, but that Jackson was altering the conclusions with respect to whether discrimination or retaliation had occurred. Doc. #72-1 at 3.

Joan Ellis, the DOC's FOIA Administrator and a work acquaintance of Callahan's, received Callahan's "unusual" FOIA request and set to work. Doc. #60-14 at 18.[3] While going through plaintiff's e-mails on April 21, 2011, she noticed that there was a large volume of personal e-mails—e-mails relating to church business, vacation bookings, and other purely personal matters beyond mere community outreach. These e-mails were being sent and received

---

[2] Plaintiff suspects—without adducing any admissible evidence in support of this belief—that defendant Sandra Sharr, Director of Legal Affairs, tipped off Callahan about plaintiff's complaint against Callahan, which was the impetus for Callahan's FOIA request.

[3] Plaintiff, too, made a FOIA request for Callahan's e-mails, the results of which he received on April 28, 2011. Doc. #70-8 at 1.

by plaintiff during work hours, in clear violation of several administrative directives that govern DOC employees.

Although she had never before reported an employee for e-mail misconduct that was revealed by a FOIA request, Ellis decided to report plaintiff's email usage to her supervisor, Brian Garnet, because she had never previously seen this quantum of personal email usage. Doc. #60-14 at 22–23.[4] Garnet, in turn, reported the matter to Arnone, even though neither FOIA requests nor this type of workplace policy violation are normally reported to the Commissioner. *See* Doc. #60-7 at 23–25.

Ellis eventually briefed Arnone on the matter by showing him a sampling of plaintiff's e-mails from over 1,000 personal e-mails found on plaintiff's computer. On April 26, 2011, Arnone directed a Security Division investigation into the violations. Doc. #60-20 at 1. He specifically cautioned that neither Callahan nor plaintiff be made aware of the investigation or its outcome.

On May 9, 2011, the Security Division investigator who was assigned to assess plaintiff's computer misuse issued a report finding that plaintiff had violated several administrative directives. Doc. #60-20. Plaintiff admitted to the investigator that he had violated these directives, but insisted that "a building wide audit would reveal a lot of this type of conduct." Doc. #60-19 at 5, 8.[5]

On May 13, 2011, plaintiff received in-hand notice that a pre-disciplinary *Loudermill* hearing would take place on May 17, 2011, for his computer infraction. On May 16, 2011,

---

[4] That same day, plaintiff wrote to Jackson and requested that plaintiff no longer have responsibility for reviewing recruitment packages because he was afraid of "facing . . . repercussions." Doc. #60-11 at 2.
[5] Months later, plaintiff would provide the names of several other DOC employees—some of them his friends—who used their computers for personal matters; those employees would also be disciplined. *See* Doc. #71-1 at 4–5.

plaintiff requested additional time to seek legal counsel and prepare for his hearing, and he was granted an extension to May 19, 2011. On May 17, plaintiff again requested additional time so that he and an attorney could review the hundreds of personal e-mails the DOC asserted were improper; but by an e-mail sent at 5:02 p.m. on May 18, 2011, plaintiff was denied an additional extension and told that his *Loudermill* hearing would proceed on May 19, 2011. On the date of his scheduled *Loudermill* hearing, plaintiff had already retained an attorney, was at work, and knew that the hearing was proceeding and that he had the right to present evidence in his defense, and yet he decided not to attend.

After the *Loudermill* hearing, the DOC's Labor Relations office recommended that plaintiff be issued a written reprimand. Arnone, who did not personally supervise plaintiff, concurred with the discipline and decided to take the "unusual" step of personally issuing plaintiff an unsatisfactory promotional working test period performance evaluation. *See* Doc. #60-7 at 41 ("[a]bsolutely not" typical for a commissioner to give a working test period failure performance evaluation to a mid-level manager whom he did not supervise). Although the evaluation set forth several metrics by which to rate plaintiff, Arnone rated plaintiff in only one category, "Judgment," and rated him overall as "Unsatisfactory" because of his violation of the computer policies. Doc. #70-11.[6] Arnone issued this performance evaluation on May 23, 2011, just one day before plaintiff's working test period for Equal Employment Opportunity Manager was to expire.

It was no coincidence that plaintiff's discipline was imposed before the end of his working test period: the Security Division investigator assigned to plaintiff's computer-misuse

---

[6] The only other time Arnone recalls issuing a performance evaluation like this one—that is, not filling out the entire evaluation—was for Jackson. Doc. #60-7 at 32. Arnone had also been involved in the decision to terminate Jackson.

case had been told to handle the investigation promptly, before the investigator was scheduled to go on a vacation, Doc. #72-3 at 3, and specifically referenced the end of plaintiff's working test period in his report. Arnone had even told plaintiff: "I can't discipline you here and then allow you to finish the working test period." Doc. #60-7 at 30. Because he received this negative evaluation, plaintiff failed his working test period: he reverted back to his prior position as Equal Employment Specialist 2, received a lesser pay, and was prohibited from being promoted for a two-year period.

In the meantime, on May 11, 2011, defendant Kimberly Weir (black female) had become the acting director of the affirmative action unit. By then, Jackson had been removed from his position, fired for retaliating against staff in the affirmative action unit (Borton and Sass) who had participated in the investigation of Callahan's complaint against Jackson. *See* Docs. #60-39 at 12; #60-4 at 7. Weir held her new role as acting director of the affirmative action unit simultaneously with her current role as director of the Security Division, which she had headed at the time the investigation into plaintiff's computer usage had been initiated. As soon as she started, she immediately began to make changes to how the affirmative action unit was run, and plaintiff and a few others in the affirmative action unit wrote to Arnone on June 9, 2011, with their concerns. *See* Doc. #60-32 at 1 ("This is a very sensitive time for us[;] . . . some of our staff have been extracted out of our unit, another one of our colleagues was dismissed, our Director has been walked out, and now we are feeling like we are being subjected to unnecessary pressures."). In the letter, plaintiff requested that Weir not be informed of their concerns "out of fear for any repercussions or retaliatory actions," *id.* at 1, but in his letter responding to plaintiff, Arnone sent a copy to Weir. *Id.* at 2.

Soon after her move to the affirmative action unit, Weir began to closely monitor her new subordinates' attendance. Plaintiff (and several other employees) took great offense to Weir's hypervigilance and, by letter dated August 8, 2011, plaintiff suggested that her scrutiny was "intimidating" and the product of his "being targeted." Doc. #60-33 at 1–2.

In January of 2012, Weir sent an e-mail to the entire affirmative action unit setting a strict deadline by which all employees were to complete their many overdue investigations. *See* Doc. #60-36 at 6. Plaintiff explained to Weir that his outstanding investigations could be attributed to his taking intermittent FMLA leave for medical problems caused by workplace stress, Doc. #60-34 at 1, but Weir responded callously on February 1, 2012, that plaintiff had a track record of being late in submitting his reports, that his FMLA-covered medical absences did not fully account for his lack of productivity, and that she could not possibly have caused plaintiff's stress because she was merely "holding you accountable for your work . . . ." *Id.* at 2.[7]

Soon after this exchange, on March 5, 2012, the DOC, with Arnone's blessing, created a new job post within the affirmative action unit: Legislative and Administrative Advisor 2. Doc. #71-7 at 4, 7. On the website listing this new post, the DOC wrote: "At the present time, the oversight of [affirmative action] investigations has been assigned to [Weir], based on lack of available managerial staff. . . . Current backlogs . . . require that this position be established as soon as is possible." *Id.* at 6.

The new position of Legislative and Administrative Advisor 2 called for performance of many of the functions that had been performed by plaintiff before he failed his working test

---

[7] Within days of that exchange, Weir removed an employee from plaintiff's supervision because both were behind in submitting reports. Doc. #60-35 at 1. Plaintiff told Weir that he would consider removal of a directly reporting employee as a "sign of retaliation," but Weir responded that it was intended to lighten his load until such time that plaintiff is "in a position to manage your own work load and assume responsibility for others." *Ibid.* The removed employee protested to Weir, and explained that all employees in the affirmative action unit had outstanding investigations because they were understaffed, and that plaintiff was an excellent supervisor. Doc. #71-4 at 2.

period as Equal Employment Opportunity Manager: conducting investigations, overseeing others' investigations, and conducting certain trainings. *Id.* at 6. But the position added more duties than plaintiff had previously shouldered, and added a new requirement that the employee have a law degree, because the DOC envisioned for this position "research and assistance in matters pertaining to legislation, regulations and administrative policy, including the drafting [of] proposed legislation and regulations and responding to legislative inquiries in coordination with [the DOC's] Legislative liaison and the Commissioner." *Ibid.*

Weir continued to run a tight ship as head of the affirmative action unit. In a performance evaluation discussed on April 26, 2012, Weir told plaintiff that, despite having an employee removed from his supervision, he "struggles to complete assignments timely. Outstanding investigations remain a concern." Doc. #60-52 at 3, 5. Tensions built, and on June 21, 2012, Weir requested security videos from a correctional facility to confirm whether plaintiff was at a place he said he would be. After learning that plaintiff had not been at the facility, she sent an e-mail on June 25, 2012, to all affirmative action unit employees, requiring that every employee e-mail or call Weir each time he or she arrived or left for the day. Doc. #60-36 at 7. Plaintiff was to have another performance review with Weir the next day, but upon receipt of this e-mail, which appeared to directly target him, he requested that a witness be present during his performance review with Weir.

At his performance review with Weir, plaintiff refused to sign his own evaluation, which stated that he "has the potential to be an effective manager; however, he needs to work on passive aggressive behavior, improve time management skills and be more receptive to constructive criticism and feedback." Doc. #60-52 at 6. The meeting continued, fraught, as true for almost all communications between the two, and soon Weir brought up the video tapes

purporting to reflect plaintiff's unexcused absence. Plaintiff got upset and left the meeting, and immediately filed an incident report. In the report, plaintiff recounted the meeting and stated that he was being "harassed," "targeted," and "retaliat[ed] against" by Weir, and stated that he goes to work "in fear that she is watching me and will do something to harm me!" Doc. #60-43 at 1. In her responsive incident report, Weir stated that she, too, had begun to fear for her safety during that meeting. Doc. #60-53 at 1.

The list of hostile encounters between Weir and plaintiff need not be reviewed here in its entirety. *See, e.g.*, Doc. #71-5 at 1 (attempt by Weir to dock plaintiff's pay); *id.* at 3 (Weir telling plaintiff not to abuse his FMLA/vacation time). Suffice it to say that Weir and plaintiff each targeted and were targeted by the other. Each suffered health consequences for working in this toxic environment. *See* Doc. #60-43 at 1–2 (plaintiff: "She has caused me to suffer from depression, and anxiety, and panic attacks [for] which I am on three different medications because of her. . . . She is going to cause me to have a heart-attack or a stroke due to the stress . . . ."); Doc. #60-45 at 3 (Weir left as acting director of the affirmative action unit on September 10, 2012, because "being attacked by [plaintiff] . . . was affecting my health. And my doctor said either I let it go or I drop dead.").[8]

On October 29, 2012, shortly before Weir's departure as acting director of the affirmative action unit, the DOC hired Holly Darin (white female) to the position of Legislative and Administrative Advisor 2. Plaintiff helped train Darin regarding the policies and procedures of the affirmative action unit, and he also helped with training three new affirmative action unit

---

[8] Around the same time the relationship between Weir and plaintiff devolved into open hostility, plaintiff also perceived slights from Tracy Butler, then-director of human resources, in her unreasonable scrutiny of plaintiff's FMLA leave in 2012, *see* Doc. #60-41; failure to discipline plaintiff's co-worker, Loyda Borton, for making age-based comments about plaintiff in June of 2012, *see* Doc. #71-11; and refusal to allow plaintiff to put documents into his personnel file, *see* Doc. #61-1 at 146.

employees. Doc. #71-10 at 1. At that time, Darin was not the acting director of the affirmative action unit, but she later applied for and received that position. Doc. #61-1 at 152.

Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities on August 12, 2011, and he eventually filed this lawsuit on August 12, 2013.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Plaintiff claims that he was subject by the DOC to Title VII retaliation as well as to Title VII race- and gender-based discrimination (Count I). In addition, he alleges equal protection violations by the individual defendants pursuant to § 1983 (Counts III through VII). Each of these claims will be discussed in turn.

As an initial matter, I will grant defendant's motion for summary judgment on plaintiff's CFEPA claim (Count II), because the Eleventh Amendment plainly bars relief against the DOC as an entity of the State of Connecticut and because neither the State nor Congress has waived Eleventh Amendment immunity against CFEPA claims in federal court. *See Pawlow v. Dep't of Emergency Servs. & Pub. Prot.*, 172 F. Supp. 3d 568, 577–78 (D. Conn. 2016) (collecting cases). Contrary to plaintiff's assertion, defendant DOC did not waive this defense, as it was pleaded in the answer. Doc. #15 at 14 (second affirmative defense).

### Title VII Retaliation

Under Title VII of the Civil Rights Act of 1964, an employer may not "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or *participated in any manner* in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a) (emphasis added).

Plaintiff's claim of retaliation is governed by the familiar *McDonnell Douglas* burden-shifting framework. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010). This framework requires him to show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001). An adverse employment action is judged by an objective standard: "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. . . . [N]ormally petty slights, minor annoyances, and simple lack of good manners in the workplace fall well short of

this standard." *Sacco v. Legg Mason Inv. Counsel & Trust Co., N.A.*, 660 F. Supp. 2d 302, 313 (D. Conn. 2010) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

Critical to this claim is how one defines what was plaintiff's "protected activity." In its opening brief, the DOC did not challenge whether plaintiff engaged in a protected activity. *See* Doc. #60-1. But in its reply, the DOC for the first time argued that plaintiff had not engaged in a protected activity because his only alleged protected activity was generally opposing discrimination by making sure all qualified applicants, including "goal applicants," were considered fairly. *See* Doc. #76 at 3; *Cooper v. N.Y. Dep't of Labor*, 819 F.3d 678, 681 (2d Cir. 2016) (*per curiam*) (firing of director of equal opportunity development office for opposing amendment of internal procedures that increased likelihood of discrimination did not constitute Title VII retaliation: "opposing an employer's failure to engage in affirmative action is nevertheless unprotected under the statute" and does not qualify as a "protected activity"); *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 2016) (objecting to an employer's failure to adhere to its own affirmative-action program is not protected activity because such a failure is not an "unlawful employment practice" under Title VII); *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 381 (E.D.N.Y. 2013) (presenting cases of discrimination to upper management as part of job duties in diversity office does not constitute "protected activity"), *aff'd*, 578 F. App'x. 34 (2d Cir. 2014). I need not consider the DOC's argument in this regard (or determine whether plaintiff had been opposing discrimination on behalf of specific applicants, *e.g.*, Doc. #70-4), because the argument was not timely and properly raised. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

But even considering the DOC's argument on its merits, the argument overlooks evidence that plaintiff engaged in "protected activities" beyond merely working in the affirmative action unit: (1) he filed a liberal amount of complaints on his own behalf against employees of the DOC, opposing perceived discrimination against him on the grounds of race, gender, and age; *see, e.g.*, Doc. #60-38 at 1, 9 (July 2011 complaint for age discrimination against Loyda Borton substantiated); Doc. #60-37 at 3 (CHRO complaint for failure of working test period); and (2) he participated in, and provided testimony with regard to, investigations of other complaints of discrimination/retaliation within his unit.[9] *See Hicks v. Baines*, 593 F.3d 159, 161–62 (2d Cir. 2010) (protected activities include participating in any manner in an investigation, proceeding, or hearing pursuant to Title VII). I conclude that plaintiff has established at least a genuine fact issue that he engaged in a protected activity when he participated in the investigation of the Jackson/Callahan complaints relating to the incident of September 3, 2010. *See* Doc. #60-10 (plaintiff's statement regarding September 3, 2010, incident).

The question then becomes whether the desire to retaliate against plaintiff for this protected activity was the but-for cause of an adverse employment action. Plaintiff asserts that he was subject to numerous adverse employment actions, but most critical in this case is the alleged adverse employment action allegedly resulting from Callahan's FOIA request: the discipline imposed after the FOIA request revealed plaintiff's violation of several administrative directives regarding use of a work computer for personal reasons.[10]

---

[9] Indeed, the Department of Administrative Services (DAS), tasked with investigating complaints made by or against anyone within the affirmative action unit, put it well: "Since the fall of 2010, all of the members of the Affirmative Action unit have been involved as complainants, respondents or witnesses in investigations of several different discrimination complaints filed by or against members of the unit . . . ." Doc. #60-38 at 2–3.

[10] Plaintiff does not assert that the FOIA request, itself, was an adverse employment action, even though it seems that having a disgruntled co-worker search your e-mail records to find dirt on you—something a co-worker

I view plaintiff's theory of recovery for his discipline as alleging a "cat's paw" theory of liability. The Second Circuit has recently held that the "cat's paw" theory of liability supports recovery for claims of retaliation in violation of Title VII, and it arises when "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272–73 (2d Cir. 2016) (quoting *Cook v. IPC Intern. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (Posner, J.)).

Here, plaintiff was subject to discipline by Arnone, who arguably had no desire to retaliate against plaintiff and ostensibly imposed discipline on plaintiff only after an independent investigation into plaintiff's computer misuse by members of the Security Division. But a genuine fact issue remains whether the disciplinary process leading to Arnone's ultimate decision was tainted and manipulated by Callahan, who did have such a motive to retaliate against plaintiff and intended to bring about the adverse employment action.

To be sure, the record evidence could support the contrary conclusion: from Callahan's perspective, Callahan made his FOIA request because plaintiff appeared to be on Jackson's side in the all-out war between Jackson and Callahan, and Jackson was using plaintiff to help retaliate against Callahan. *See* Docs. #72-1 at 9, #60-9 at 20. Indeed, only days before the request, on March 31, 2011, Callahan filed a complaint against plaintiff for harassment "in retaliation for [Callahan's] filing a complaint against Robert Jackson in September 2010." Doc. #70-6 at 1. But

might be prohibited from doing if not employed by an agency subject to the Freedom of Information Act—might very well "dissuad[e] a reasonable worker from making or supporting a charge of discrimination." *See Burlington*, 548 U.S. at 67. *Cf. Murphy v. Spring*, 58 F. Supp. 3d 1241 (N.D. Okla. 2014) (discussing public employer's unauthorized access of plaintiff's private e-mails in context of retaliation, invasion of privacy, and other causes of action); *Nepomuceno v. Astellas US LLC*, 2013 WL 3746143, at *5 (D.N.J. 2013). *See also* Doc. #60-4 at 18 (FOIA administrator considered Callahan's request "unusual").

a reasonable jury could also conclude that Callahan had filed his complaint of March 31, 2011, against plaintiff because plaintiff opposed Callahan's discriminatory treatment of Jackson, or at the very least participated in the investigation of Callahan's complaint against Jackson by giving testimony favorable to Jackson.

In other words, a jury could reasonably conclude that Callahan perceived plaintiff to be advocating for an alleged victim of Title VII discrimination (Jackson), or knew of plaintiff's participation in a Title VII investigation; that Callahan wanted plaintiff to stop advocating for Jackson, or to punish him for having providing testimony in that investigation; and that Callahan's FOIA request was motivated by a desire to retaliate against plaintiff for opposing Callahan's alleged discrimination against Jackson, or participating in the investigation. *See* Doc. #70-8 at 2 (FOIA request, on its face, requested plaintiff's records *on and after September 3, 2010*); Doc. #60-9 at 6 (Callahan describes "the September 3rd issue between Bob [Jackson] and I, that was a [plaintiff] issue . . . ."). Whether Callahan's desire to retaliate was the but-for cause of his FOIA request is an issue that a jury should decide. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

If a reasonable jury could conclude that Callahan's FOIA request was motivated by a desire to retaliate against plaintiff for opposing Callahan's discriminatory treatment of Jackson (or giving testimony regarding Callahan's complaint), a jury could reasonably infer that the disciplinary process resulting from the FOIA request was tainted by Callahan's impermissible motive to retaliate against plaintiff, even if Callahan played no part in imposing the ultimate discipline on plaintiff for computer misuse. To this point, the DOC essentially argues that plaintiff's ultimate discipline—a written reprimand resulting in his failed working test period— was not proximately caused by Callahan's actions because several intervening acts (*e.g.*,

Callahan's ignorance that plaintiff was misusing his computer, plaintiff's choice not to attend his *Loudermill* hearing) severed the causal connection between any retaliatory motive by Callahan and plaintiff's ultimate adverse employment action. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 & n.3 (2011) (describing "intent" and proximate causation).

Again, this is a triable issue. Although Callahan may not have known that plaintiff had violated several administrative directives regarding computer usage when he made his FOIA request, he very clearly intended an adverse employment action to result to plaintiff; after all, Callahan expected when he made the FOIA request to find evidence that plaintiff had been retaliating against Callahan on behalf of Jackson, the "puppet master," and desired to "expose" plaintiff's misconduct within the affirmative action unit. *See* Doc. #60-9 at 20–21. A reasonable jury could certainly conclude that Callahan's actions—which were intended to produce a disciplinary consequence for plaintiff—set in motion the series of events that led to plaintiff's receipt of discipline, and that plaintiff's disciplinary process was tainted by an impermissible motive to retaliate against him for siding with Jackson in Jackson's Title VII complaint against Callahan.

Nor was the DOC's investigation into plaintiff's computer misuse, or the ultimate discipline imposed on plaintiff, fully and completely "unrelated" to or "independent" from Callahan's original retaliatory action. *See Staub*, 562 U.S. at 421 ("[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable. But the supervisor's biased [action] may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.").

Several unsettling facts raise a triable issue regarding the "independence" of the investigation and the discipline that resulted from Callahan's arguably impermissibly motivated FOIA request:

- Ellis found Callahan's FOIA request to be "unusual," and yet continued on;

- It was unusual for Arnone to learn of employee violations of administrative directives, or even personally request investigations in such violations, but he did both here;

- Despite some evidence that *Loudermill* postponements were common, several DOC employees rushed the investigation and disciplinary process, and understood that the end of plaintiff's working test period was coming up, *see* Doc. #72-3 at 3 (investigator told to prioritize this investigation before leaving for vacation); Doc. #60-20 at 1 (investigative findings reference plaintiff's working test period); Doc. #60-22 at 1 (plaintiff denied second extension of *Loudermill* hearing);

- Arnone imposed plaintiff's discipline the day before plaintiff's working test period was to end because he wanted plaintiff to fail the working test period, *see* Doc. #60-7 at 30 (Arnone told plaintiff during meeting: "I can't discipline you here and then allow you to finish the working test period."); *id.* at 28 (Arnone discussing that in any event he could have ensured plaintiff's failure of the working test period by extending that period);

- Despite not being plaintiff's supervisor, Arnone personally issued plaintiff the unsatisfactory evaluation that caused failure of the working test period, which is "[a]bsolutely not" normal, *see id.* at 41; and

- Arnone was arguably on Callahan's "side" in the Jackson/Callahan dispute, and believed that the affirmative action unit was trying to pull an "immature" "power play" on human resources, *see id.* at 45.

*See Collins v. Conn. Job Corps*, 684 F. Supp. 2d 232, 252 (D. Conn. 2010) (plaintiff may "show that forbidden purposes lurk in [an alleged non-discriminatory employment] decision" by pointing to "[d]epartures from procedural regularity").

At trial, defendant will be free to argue to the jury that Callahan's actions did not proximately cause plaintiff's adverse employment action, perhaps because plaintiff did not attend his *Loudermill* hearing, or perhaps because plaintiff's computer violations were particularly flagrant and would have been discovered eventually. And defendant will also be free to argue that Arnone's investigation into plaintiff's computer misuse was truly independent of Callahan's

FOIA request, and that the "unusual" actions taken in initiating the investigation and imposing discipline on plaintiff were appropriate responses in light of the disastrous states of the affirmative action unit and human resources at that time, or were an attempt by Arnone to mentor plaintiff in the hopes that plaintiff would recover from this incident and again rise up within the DOC.

Ultimately, however, plaintiff has presented a plausible narrative, supported by testimony and other evidence, that would permit a jury to find that Callahan's decision to make a FOIA request was motivated by a desire to retaliate against him for opposing Jackson's treatment (or merely providing testimony for Jackson in connection with Callahan's complaint), and that Arnone's involvement in imposing discipline for the infractions revealed by the FOIA request was not fully separate from Callahan's retaliatory motive. In sum, therefore, I conclude that these are all triable issues that preclude summary judgment on the retaliation portion of Count I of the complaint.

### Title VII discrimination (race and gender)

I turn now to plaintiff's claim of discrimination on the basis of his race or gender. Under Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). To prove his case, plaintiff must show "(1) that he belonged to a protected class; (2) that he was qualified for his position . . . ; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred," at least in part, because of plaintiff's protected status (*e.g.*, his race or gender). 42 U.S.C. § 2000e-2(a), (m); *Nassar*, 133 S. Ct. at

2526; *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251–52 (2d Cir. 2014); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

Plaintiff has met his *prima facie* burden: he belonged to a protected class (African American male); he was qualified for his position as Equal Employment Opportunity Manager; he received discipline that resulted in his removal from his position as Equal Employment Opportunity Manager; and his removal as manager caused him a loss in pay, position, and prestige. Plaintiff has also met his minimal burden of showing that he was disciplined in a manner that gives rise to an inference of discrimination: the person who replaced plaintiff—and whom he had to train—was an employee (white female) outside of his protected class, which suffices to raise an inference of discrimination. *See Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). Defendant, in turn, offered a legitimate, non-discriminatory reason for the discipline resulting in plaintiff's removal as manager: plaintiff's flagrant violation of the administrative directives regarding computer usage.

It is a closer case whether plaintiff has adduced sufficient evidence to show that defendant's proffered reason for the discipline was a mere pretext for discrimination on the basis of plaintiff's *race* or *gender*, as distinct from retaliation for plaintiff's engaging in an activity protected by Title VII. *See Abrams*, 764 F.3d at 251. Even if "defendant's explanation for an employment practice is 'unworthy of credence,'" the plaintiff still must ultimately prove "[t]he crucial element," for his cause of action, which is "discrimination, not dishonesty." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 155–156 & 155 n.5 (2d Cir. 2010); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514–15 (1993).

Therefore, a discrimination claim may require more than just evidence that an employee was treated differently from his co-workers—it requires proof that the differential treatment was actually motivated by plaintiff's protected status. The matter is further complicated in this case, in part because plaintiff's job duties entailed open discussions of race and gender, and in part because plaintiff was criticized—and targeted—only for his job performance.

In support of his racial discrimination claim, plaintiff points to evidence suggesting that he, specifically, was treated differently than others: (1) Callahan's FOIA request and his shifting reasons for requesting plaintiff's e-mails; (2) plaintiff's discipline for computer misuse and others' lack of discipline for the same misconduct; (3) Arnone's unusual personal involvement in the disciplinary process; and (4) the fact that the Legislative and Administrative Advisor 2 position involved essentially the same job functions plaintiff had performed but added a credential he did not hold, perhaps to purposefully exclude him from attaining that position in the future. *See* Doc. #69 at 15–18. Plaintiff then places those specific instances of conduct in the overall context of his work as an employee of the affirmative action unit, and he argues that a reasonable jury could infer that plaintiff's discipline was racially motivated because he ensured fair consideration of candidates that may frequently have been of his same race.

I do not agree that this suffices for pretext on the racial discrimination claim. There is no evidence to suggest that Callahan's FOIA request was motivated by racial animus as opposed to the desire to retaliate against plaintiff for his protected activities in support of Jackson. Accordingly, the "cat's paw" theory does not work for this claim for lack of an invidious paw. Moreover, there is no evidence to suggest that the discipline imposed by Arnone was motivated by racial animus in a manner distinct from any quarrels with how plaintiff did his job as an advocate in the affirmative action unit for those frequently of the same race, *see Cooper*, 819

F.3d at 681, or in a manner distinct from any desire to retaliate against plaintiff for supporting Jackson in Jackson's claim of racial discrimination.

Nor does the fact that the DOC may have a history of discrimination in imposing discipline raise a triable issue regarding pretext in this case. Plaintiff's argument in this regard is, as confirmed by plaintiff's counsel at oral argument, essentially a species of his retaliation claim: plaintiff was disciplined, at least in part, because he took seriously his role as an affirmative action unit employee. But plaintiff's work in the unit, alone, does not suffice to show pretext for the decision to discipline him because of his race, and it speaks, if at all, to plaintiff's claim of retaliation. *See ibid.* Simply put, the tensions present in this toxic work environment and the concomitant criticisms lodged against plaintiff for his work in the unit may have been related to discussions of race, but those tensions do not, on the record here, lead to a triable inference that plaintiff was targeted even in part because of his race.

The evidence likewise does not suffice for pretext on any gender discrimination claim, which plaintiff's counsel confirmed at oral argument is supported by the same evidence he advances in support of his *prima facie* case: that a member outside of plaintiff's protected class succeeded in obtaining the position of Legislative and Administrative Advisor 2, a position for which plaintiff was admittedly unqualified. Even viewing the facts in the light most favorable to plaintiff, it would not be reasonable to infer, without more, that defendant added qualifications (a law degree) and job duties (*e.g.*, drafting proposed legislation and regulations) to the Legislative and Administrative Advisor 2 position, which was later filled by a woman, in order to exclude and discriminate against plaintiff because of his gender.

In short, no reasonable jury could conclude that plaintiff's discipline was motivated by his race or gender. Therefore, I will grant defendant's motion for summary judgment on plaintiff's claim of Title VII discrimination.

### Equal Protection Claims

Lastly, the individual defendants move for summary judgment on plaintiff's equal protection claims brought pursuant to § 1983. "Once action under color of state law is established, [plaintiff's] equal protection claim parallels his Title VII claim. The elements of one are generally the same as the elements of the other and the two must stand or fall together." *See Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004). Because there is no genuine issue of fact to support plaintiff's Title VII discrimination claim against the DOC, there is no need for me to consider his cognate equal protection discrimination claims against the individual defendants. On the other hand, because I have concluded that a genuine fact issue remains as to plaintiff's Title VII retaliation claim, I will consider the remaining equal protection claims insofar as they rest on plaintiff's evidence of retaliation.

The individual defendants each assert that they are entitled to qualified immunity for their actions. Not every violation of the Constitution justifies an award of money damages in a civil lawsuit like this one. That is because the doctrine of qualified immunity protects individual government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In this manner, "qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014). It follows that a public official is entitled to qualified immunity if "(1) his conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015).

Evaluating the first prong of qualified immunity, I conclude that the right to be free from retaliation for engaging in activity protected by Title VII was clearly established in 2011 at the time of the conduct at issue in this case. *See Hicks*, 593 F.3d at 171 (2010 ruling stating that Equal Protection Clause prohibits retaliation for "participation in discrimination investigations and proceedings"); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 81–82 (2d Cir. 2015) (discussing *Hicks* and reaffirming principle that "[w]hen a supervisor retaliates against an employee because he complained of discrimination, the retaliation constitutes intentional discrimination against him for purposes of the Equal Protection Clause.").

Turning to the second prong, I would ordinarily evaluate the objective reasonableness of the defendant's actions. But an equal protection claim requires a showing of subjective intent to discriminate or retaliate. *See Vega*, 801 F.3d at 82. Where, as here, the constitutional claim contains a subjective component such as the specific intent to retaliate against plaintiff because of a protected activity, the qualified immunity inquiry changes. To avoid the bar of qualified immunity on a motion for summary judgment, plaintiff must make a "heightened" showing of "particularized evidence of direct or circumstantial facts . . . supporting the claim of an improper motive . . . . [T]he particularized evidence of improper motive may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995); *Baker v. Connecticut*, 2006 WL 581205, at *14–15 (D. Conn. 2006).

As for defendant Tracey Butler, plaintiff has fallen woefully short of his burden to adduce "particularized evidence" of an improper motive to retaliate against plaintiff for participating in the investigation of Callahan's complaint against Jackson, or for opposing discrimination made unlawful by the Equal Protection Clause.[11] Plaintiff has offered evidence only for his claim that Butler discriminated against him on the basis of his race, but insofar as that same evidence might be probative of his claim of retaliation, Butler's alleged actions occurred long after plaintiff's discipline and removal as manager, and they had little, if anything, to do with plaintiff's participation in his own or Jackson's internal complaints. I will grant summary judgment to Butler on the basis of qualified immunity.

As for defendant Kimberly Weir, plaintiff again offers evidence relating only to his claim that Weir harbored discriminatory—and not retaliatory—animus towards plaintiff, and only with respect to events occurring after plaintiff's discipline for computer misuse. The evidence of Weir's distrust of plaintiff may be strong, but it does not arise in a context suggestive of a desire to retaliate against plaintiff for participating in the investigation of Callahan's complaint against Jackson, or for opposing discrimination made unlawful by the Equal Protection Clause. The record does not reasonably support an inference that Weir cared, one way or another, about plaintiff's participation in the Jackson/Callahan dispute, or about plaintiff's lodging of his own claims of discrimination against others. Instead, the records suggest only that Weir was a demanding and sometimes antagonistic boss to most (if not all) of her subordinates, of all races and genders, and regardless whether they had engaged in protected activity. I will grant summary judgment to Weir on the basis of qualified immunity.

---

[11] Plaintiff alleges that: (1) Butler unreasonably scrutinized plaintiff's FMLA leave (even if he was never denied leave) in 2012; *see* Doc. #60-41; (2) in June of 2012, Butler declined to discipline plaintiff's co-worker, Loyda Borton, for making age-based comments about plaintiff, *see* Doc. #71-11; and (3) Butler did not allow plaintiff to put documents into his personnel file, *see* Doc. #61-1 at 146.

As for defendant Sandra Sharr, plaintiff effectively abandoned his claim against her at oral argument. Even if this claim had not been abandoned, I find that plaintiff has adduced no admissible evidence about Sharr in support of his claim. The only evidence in the record is plaintiff's "reasonabl[e] belie[f] [that] Sandra Sharr tipped off Callahan that I have filed a complain[t] against him" for the incident of March 29, 2011, *see* Doc. #70-3 at 1 ¶ 5, which in part may have prompted Callahan's FOIA request. But there is no *admissible* evidence in the record here on this point, and so I will grant summary judgment to Sharr on the basis of qualified immunity because plaintiff has failed to make any particularized and admissible showing of Sharr's improper motive.

As for defendant Arnone, the evidence also falls short of creating a jury issue that he acted against plaintiff because of plaintiff's protected activity. As the ultimate decisionmaker, there is no doubt that Arnone took action adverse to plaintiff, but the issue remains whether he did so because of plaintiff's involvement in protected activity. Although the evidence suggests that Arnone generally favored Callahan over Jackson and that he distrusted Jackson, there is no "particularized" evidence that Arnone specifically wished to target Jackson's protected activity of filing a complaint against Callahan, much less that Arnone derivatively sought to target plaintiff because of plaintiff's protected activity in support of Jackson. There were ample alternative reasons involving plaintiff's improper use of the DOC's computer for Arnone's disciplinary action against plaintiff; thus, the evidence falls well short of any "heightened" showing of a specific improper motive by Arnone. Arnone is entitled to qualified immunity.

As for defendant Callahan, I conclude that he is not entitled to qualified immunity at this time. Callahan's decision to FOIA plaintiff's e-mails was a "highly unusual" action that, in light of the context by which it arose, Callahan's own statements in e-mails to plaintiff and Jackson,

and the dates listed within the request itself, provides particularized evidence of an impermissible motive to retaliate against plaintiff for his protected activity.

### CONCLUSION

Defendants' motion for summary judgment (Doc. #60) is GRANTED in part as to Count I (Title VII discrimination) and DENIED in part as to Count I (Title VII retaliation); GRANTED as to Count II (CFEPA discrimination and retaliation); GRANTED as to Count III (equal protection claim against defendant Leo Arnone); DENIED as to Count IV (equal protection claim against defendant Daniel Callahan); and GRANTED as to Counts V through VII (equal protection claims against defendants Kimberly Weir, Tracey Butler, and Sandra Sharr).

The parties shall file their joint trial memorandum by August 2, 2017. Jury selection shall proceed on September 7, 2017 (with a back-up jury selection date of October 5, 2017, in the event that other trials take precedence). Please refer to the District of Connecticut website for my "Trial Preferences" and "Instructions for Joint Trial Memorandum."

It is so ordered.

Dated at New Haven, Connecticut, this 2d day of June 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge