# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHRISTIAN MOORE,<br>    *Plaintiff*,<br><br>v.<br><br>CONNECTICUT DEPARTMENT OF<br>CORRECTION, *et al.*,<br>    *Defendants*. | No. 3:13-cv-01160 (JAM) |

## RULING ON MOTION FOR RECONSIDERATION

Plaintiff Christian Moore brought this lawsuit alleging discrimination and retaliation arising from a lengthy period of workplace conflict between the affirmative action and human resources unit at the Connecticut Department of Correction ("DOC"). This Court earlier entered a ruling granting in part but denying in part defendants' motion for summary judgment. Doc. #82. Defendants have now moved for reconsideration of that earlier ruling insofar as it denied summary judgment as to two of plaintiff's claims. I will grant the motion for reconsideration as to plaintiff's remaining Equal Protection claim against defendant Callahan, but deny the motion as to plaintiff's Title VII retaliation claim against the DOC.

### BACKGROUND

The factual background of this case is set forth at length in my earlier ruling on the motion for summary judgment. *See Moore v. Department of Correction*, 2017 WL 2413690, at *1–8 (D. Conn. 2017). Of particular import for purposes of this motion is the sequence of events leading to plaintiff's discipline on May 23, 2011. Plaintiff, who held the position of Equal Opportunity Employment Specialist 2 in the affirmative action unit, became caught up in long-standing feud between the director of his unit, Bob Jackson, and the director of human resources,

1

defendant Dan Callahan. At one point plaintiff was interviewed as part of the investigation into complaints Jackson and Callahan had filed against each other. *Id*. at *3. Subsequently, during one particularly heated incident, plaintiff and Callahan accused each other of retaliation for their respective roles in this earlier dispute between Callahan and Jackson. *Id*. at *4. Looking for dirt on plaintiff and Jackson to aid in his disputes with them, Callahan then sent a Freedom of Information Act ("FOIA") request to the DOC's legal department, seeking *inter alia* "all emails to or from Robert Jackson and Christian Moore for the last two years." *Ibid*. While working on this FOIA request, the DOC's FOIA Administrator discovered that plaintiff had been using his work email account to send a large volume of personal messages. *Ibid*.

The DOC ultimately conducted an investigation into plaintiff's use of his work email account for private purposes, which violated Department policy. Leo Arnone, the Commissioner of Corrections, specifically cautioned that neither plaintiff nor Callahan were to be made aware of the investigation. *Id*. at *5. Plaintiff was given an opportunity to present his side of the case at a *Loudermill* hearing, but declined to do so. *Ibid*. (He had requested that the hearing be delayed, and these requests were, somewhat unusually, denied. *Id*. at *5, *11.) Ultimately the investigation recommended that plaintiff be given a written sanction, and Arnone additionally issued plaintiff an unsatisfactory performance evaluation that caused him to fail his working test period for a promotion. *Id*. at *5–6.

Plaintiff brought claims against a number of defendants, including both the DOC itself and Callahan, on a number of legal theories. Defendants moved for summary judgment, Doc. #60, and the Court granted this motion in part but denied it in part. Specifically, my prior ruling allowed two of plaintiff's claims to proceed: first, against defendant Callahan for retaliation in violation of the Equal Protection Clause of the Fourteenth Amendment, and second, against

defendant DOC for retaliation in violation of Title VII of the Civil Rights Act of 1964. *Id*. at *12, *15. I held that plaintiff's retaliation claim against the DOC could be upheld on a "cat's paw" theory, in which even though Arnone, the ultimate decision-maker as to plaintiff's discipline, may not himself have had a retaliatory motive, his decision may arguably have been infected by Callahan's desire to retaliate. *See id*. at *10–12; *see also Vasquez v. Empress Ambulance Service, Inc.*, 835 F.3d 267, 272–73 (2d Cir. 2016) (approving cat's paw theory of liability).

Defendants have now moved for reconsideration of my earlier ruling denying summary judgment as to these two claims. Doc. #83.

### DISCUSSION

Motions for reconsideration are governed by Local Rule of Civil Procedure 7(c), which provides that "such motions will generally be denied unless the movant can point to controlling decisions or data that the court overlooked in the initial decision or order." This standard is strict: "A motion for reconsideration is justified only where the [movant] identifies an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ayazi v. United Fed'n of Teachers Local 2*, 487 Fed.Appx. 680, 681 (2d Cir. 2012); *Barnett v. Connecticut Light & Power Co.*, 967 F. Supp. 2d 593, 596 (D. Conn. 2013).

### *Title VII Retaliation Claim Against DOC*

As defendant notes, the cat's paw theory was never fully briefed by the parties, though it was raised at oral argument. This may have contributed to the fact that my summary judgment ruling, in discussing cat's paw liability, failed to address one key element of the Second Circuit's cat's paw doctrine: the requirement that the employer have acted *negligently* in giving effect to an employee's retaliatory intent. *See Vasquez*, 835 F.3d at 275 ("Only when an employer in

3

effect adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision, can the employee's motivation be imputed to the employer and used to support a claim under Title VII."). This was a clear error of law, and requires reconsideration.

Upon reconsideration, however, I affirm my earlier decision denying summary judgment as to this claim. The negligence requirement for cat's paw liability comes from agency law. The notion, as the Second Circuit explained in *Vasquez*, is that an employee's retaliatory actions will likely fall outside the scope of the employment relationship, and thus would not necessarily be imputed to the employer. *Id.* at 273–74. Under general principles of agency law, however, an agent's misconduct outside the scope of his or her employment will be attributed to the master under several conditions, most notably if "the master was negligent or reckless." *Id.* at 273. This in turn means that the master must have been at least negligent in allowing the employee's misconduct to occur.[1] Thus, a plaintiff proceeding under a cat's paw theory must show not only that some adverse employment action occurred and that some employee's retaliatory purpose was the proximate cause of that adverse action but also that the employer—not any individual supervisor or decision-maker—was negligent in allowing this retaliatory purpose to cause the adverse action.

Contrary to defendant's assertion, in other words, the question is not whether Arnone was negligent, but whether the DOC was negligent. Arnone is after all just another one of DOC's

---

[1] This is clear by comparison to the hostile work environment context. In *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court held that "although a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment. An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." *Id.* at 758–59. The Second Circuit drew the negligence requirement for a cat's paw retaliation theory from *Ellerth*. *See Vasquez*, 835 F.3d at 273–74.

4

agents, albeit in a supervisory role. And while the fact that Arnone conducted a thorough investigation, that he took steps to insulate that investigation from Callahan's influence, and that plaintiff did in fact violate the computer usage policy may all be probative as to whether DOC was negligent in allowing Callahan's action to cause plaintiff's discipline, these facts alone do not mean there is no triable issue of fact here. My original ruling identified "several unsettling facts" suggesting that the investigation may not ultimately have been independent of Callahan's retaliatory motive. The investigation was marked by a number of irregularities, and was overseen by someone, Arnone, who was arguably biased in favor of Callahan and against plaintiff. *See Moore*, 2017 WL 2413690, at *11. These same facts, I now hold, would also be enough to support a jury's verdict that DOC was negligent in permitting Callahan to retaliate against plaintiff by causing the investigation into plaintiff's email usage and the discipline that resulted from that investigation. It may be in light of the quite attenuated causality here that plaintiff faces an uphill battle to convince a jury that he was a victim of retaliation for his protected activity, but I cannot say that there is not enough here—if just barely—to present a jury question. Thus, on reconsideration I affirm my denial summary judgment as to plaintiff's Title VII retaliation claim against the DOC.

### *Equal Protection Claim Against Callahan*

Defendant Callahan requests reconsideration of my denial of summary judgment as to plaintiff's Equal Protection retaliation claim. First, he argues that the right under the Equal Protection Clause to be free from retaliation had not been clearly established in 2011, and therefore that he is entitled to qualified immunity. The question of whether the right against retaliation under the Equal Protection Clause had been clearly established as of 2011 was considered in my initial ruling, and I concluded that the rule was clearly established as of 2010

with the Second Circuit's decision in *Hicks v. Baines*, 593 F.3d 159, 271 (2d Cir. 2010). *See Moore*, 2017 WL 2413690, at *14. Since that time, however, I have subsequently ruled to the contrary in *Johnson v. Connecticut Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, 2018 WL 306697, at *7 (D. Conn. 2018), concluding that the right was not clearly established until 2015 when the Second Circuit decided *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015), a case in which the Second Circuit expressly acknowledged within the circuit "considerable confusion surrounding the viability of retaliation claims under § 1983." *Id.* at 80. In view of this acknowledgement by the Second Circuit of "considerable confusion" in the law, I now conclude on reconsideration that the viability of an Equal Protection retaliation claim under § 1983 was not clearly established law until the *Vega* decision in 2015. *See also Warburton v. John Jay Coll. of Criminal Justice of the City Univ. of New York*, 2016 WL 3748485, at *3 (S.D.N.Y. 2016) (same)*, aff'd sub nom. Warburton v. Hoffman*, 677 Fed.Appx. 9 (2d Cir. 2017).

Callahan further argues that he was merely exercising his First Amendment rights when he submitted his FOIA request, or at least that it was objectively reasonable of him to believe his actions were constitutionally protected. He relies on *Lynch v. Ackley*, 811 F.3d 569 (2d Cir. 2016), for the proposition that government officials are entitled to qualified immunity for the exercise of their own speech rights, even if they act in retaliation for a plaintiff's protected conduct. *Id.* at 580–82 (holding defendant who responded to police union's endorsement of political foe for mayor by telling reporter to file FOIA requests against plaintiff entitled to qualified immunity). This contention may well have merit, but I need not resolve it, because I conclude that in submitting his FOIA request defendant Callahan was not acting at all under color of law.

"To state a claim under § 1983, a plaintiff (1) must allege the violation of a right secured by the Constitution and laws of the United States, and (2) must show that the alleged deprivation was committed by a person acting under color of state law. . . . Generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Gleason v. Scoppetta*, 566 F. App'x 65, 68 (2d Cir. 2014) (quoting *West v. Atkins*, 487 U.S. 42, 48, 50 (1988)). "Moreover, the misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law." *Ibid* (quoting *Screws v. United States*, 325 U.S. 91, 109 (1945) (plurality opinion)).

Here it is clear that Callahan was taking no action in submitting his FOIA request that he could not have undertaken as a member of the general public. The Connecticut FOIA statute provides no greater access rights to state employees than to anyone else. *See* Conn. Gen. Stat. § 1-210(a). There is no evidence that Callahan's FOIA request was in any way aided by his status as a public employee or his official authority.

My earlier ruling denying summary judgment for Callahan on grounds of qualified immunity and for lack of state-action conduct was in error. Accordingly, I will grant Callahan's motion for reconsideration, and grant summary judgment to Callahan on plaintiff's Equal Protection retaliation claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for reconsideration (Doc. #83) is GRANTED in part and DENIED in part. The motion, and summary judgment, is GRANTED dismissing plaintiff's Equal Protection claim for retaliation against defendant Callahan, but DENIED as to plaintiff's Title VII retaliation claim against the DOC.

7

It is so ordered.

Dated at New Haven this 22nd day of March 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge